**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

BARRY MITCHELL,

Plaintiff,

v.

AVA G. JOUBERT, M.D.,
MAHBOOBEH MEMARSADEGHI, M.D.,
RAZIA SUBULIBA, N.P.,
DR. Z. JAHED,

Defendants.

Civil Action No.: BAH-25-150

# MEMORANDUM OPINION

Pending in the above-entitled civil rights case is a motion to dismiss or, in the alternative, for summary judgment, filed on behalf of Defendants Dr. Ava Joubert, Dr. Maboobeh Memarsadeghi, Dr. Zohra Jahed, and Razia Sebuluba, NP, ECF 22, supplemented at ECF 24 Although self-represented Plaintiff Barry Mitchell was advised of his right to file an opposition response to the motion and of the consequences of failing to do so, he has not opposed the motion. ECF 23. No hearing is required. Local R. 105.6 (D. Md. 2025). For the reasons that follow, the motion will be **GRANTED**.

## I. Background

At the time Mitchell filed this civil rights complaint he was incarcerated at the Maryland Correctional Training Center ("MCTC") in Hagerstown, Maryland.[1] ECF 6, at 2 (amended complaint). On or about January 28, 2022, Mitchell states that he received an x-ray of his back after he had been complaining about pain and numbness incurred while he was working at his job

[1] Mitchell is no longer incarcerated. *See* ECF 19.

assignment. *Id.* at 4. The x-ray confirmed a prior condition of "chronic malalignment" which had been aggravated by "working in the institution." *Id.*

Mitchell admits he received medication for his back pain, but states that the condition of his back degenerated and by May 30, 2023, Dr. Jahed placed him on a list for consultation for neurosurgery evaluation. *Id.* The requested consultation was denied on June 2, 2023. *Id.* at 5. Instead, it was recommended that Mitchell perform exercises. *Id.*

On October 13, 2023, Mitchell states he was seen for a neurology consultation, and it was suggested that a neurosurgical consultation would be prudent. *Id.* The consultation request was again denied by Site Medical Director Ava Joubert on January 28, 2024. *Id.*

Mitchell asserts that given the degenerative nature of his condition, which is known to all of the defendants, coupled with the insufficient treatment plan that consists only of increasing doses of pain medication, Dr. Joubert, Dr. Memarsadeghi, Dr. Subuliba, and Dr. Jahed have been deliberately indifferent to his serious medical condition. *Id.* Specifically, Mitchell states that after his January 28, 2022, x-ray results were made known to Dr. Joubert, Joubert's failure to act "in a mode conducive to slowing down or at least ascertaining a course of action to stave off my near debilitating degeneration" constitutes deliberate indifference. *Id.* at 6. When Mitchell spoke with Dr. Memarsadeghi on March 2, 2022, about the recommendation to start physical therapy, no action was taken by him to get Mitchell started on physical therapy. *Id.*

Mitchell claims that when he was referred for physical therapy in 2022, Dr. Joubert also recommended a walking aid, but Mitchell alleges he did not receive a cane until December 22, 2024. *Id.* Razia Sebuliba prescribed Mitchell Tylenol (among other medications) but neglected to prescribe a walking aid, resulting in his not receiving it until three years after his x-ray. *Id.*

Mitchell states that Dr. Jahed was "clearly inattentive with respect to carrying out the functions of or ensuring that [he] received a walking cane, physical therapy, or even the MRI." *Id.* at 7.

As a result of the alleged neglect, Mitchell states he has suffered increased weakness in his lower back and legs as well as chronic pain. ECF 6, at 5. As relief, he requests this Court to issue an order mandating that he receive an MRI and physical therapy,[2] and reasonable monetary damages. *Id.*

Defendants Joubert, Memarsadeghi, and Jahed respond that they had little to no involvement in Mitchell's medical treatment. Dr. Joubert states that she was not the Site Medical Director, but a regular onsite physician during the relevant time frame. ECF 22-2, at 2 ¶ 4. She explains that onsite providers submit consultation requests for offsite appointments and specialist visits, among other things, to the Utilization Management Department ("UM") and for review. *Id.* The request would be returned by the UM Medical Director ("UMMD") to determine if medical necessity was demonstrated by the request. *Id.* The UMMD would then either approve the request, ask for additional information, or return the request with an Alternative Treatment Plan ("ATP"). *Id.* Dr. Joubert never denied a consultation request for Mitchell. *Id.*

Dr. Joubert saw Mitchell on February 18, 2022, for a sick call complaint regarding swollen and painful ankles. *Id.* ¶ 10; ECF 24-4, at 27–28. Dr. Joubert noted that Mitchell had a midline scar from having a splenectomy and gunshot/wound exploratory surgery. *Id.* She assessed Mitchell with a sprain of the sacroiliac region and increased his Mobic prescription to 15 mg, and

[2] Mitchell's release from incarceration has made moot this portion of his request for relief. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (holding that transfer of prisoner moots his Eighth Amendment claims for injunctive and declaratory relief).

left the Cymbalta[3] prescription at 20 mg. *Id.* She told Mitchell he needed to exercise, increase his exercise, and limit his salt intake; she also submitted a request for physical therapy. *Id.*; *see also* ECF 24-4, at 25–26. The request for physical therapy was returned by the UMMD on February 21, 2022, with an ATP because medical necessity had not been demonstrated based on the information provided. ECF 22-2, at 4 ¶ 10; ECF 24-14, at 7–8. The UMMD noted that the documentation submitted outlined a plan of conservative therapy with activity modification, exercise, and anti-inflammatory medications; reassessment was suggested after the current plan was followed. *Id.*

Dr. Memarsadeghi has no recollection of meeting Mitchell on March 2, 2022, or of ever providing any medical care for him. ECF 22-3, at 2 ¶ 4. Although some records were opened by nursing staff under Dr. Memarsadeghi's name, this was only due to the fact that the 2022 computer system required nurses to enter a provider's name even when simply opening a nursing encounter and did not always reflect who the actual provider was. *Id.* Dr. Memarsadeghi further states that even if Mitchell had asked about the request for physical therapy, nothing could be done after the request was submitted to UM because the decision is solely up to the UMMD. *Id.* ¶ 5.

Dr. Zohra Jahed also states that as an onsite provider she had no control over the decision to approve or disapprove Mitchell for physical therapy as consultation requests are decided by the UMMD. ECF 22-4, at 2 ¶ 5.

Dr. Jahed disputes Mitchell's claim that he never received a cane until December 22, 2024, explaining that Physician Assistant ("PA") Crystal Jamison noted on August 17, 2022, that

[3] Dr. Joubert explains that Cymbalta is a selective serotonin and norepinephrine reuptake inhibitor antidepressant used to treat major depression, fibromyalgia, and chronic muscle or joint pain. Mobic or Meloxicam is non-steroidal anti-inflammatory drug used to relieve pain, tenderness, swelling, and stiffness caused by arthritic and joint pain. ECF 22-2, at 3 ¶ 7.

Mitchell was walking with the assistance of a cane. *Id.* ¶ 6, *see also* ECF 24-3, at 23 ("He ambulates with an antalgic gait with assistance of cane."). Additionally, Nurse Practitioner Angela McCormick noted that Mitchell had a cane on January 4, 2023. ECF 22-4, at 2–3 ¶ 6; ECF 24-2, at 26 ("Physical Exam . . . Musculoskeletal: Gait—cane."). Dr. Jahed notes that it is common for canes to be confiscated from inmates by correctional staff for security reasons, but there is no note in Mitchell's record that his cane was confiscated. ECF 22-4, at 3. Mitchell submitted a request for a cane on October 28, 2024. *Id.*; *see also* ECF 24-6, at 35–36; ECF 24-7, at 1–2. On December 22, 2024, Mitchell was provided with a cane. ECF 24-6, at 26–28.

Dr. Jahed adds that she was never Mitchell's primary care provider and that she only saw him twice while he was housed at MCTC as she worked primarily at Maryland Correctional Institution Hagerstown ("MCIH"). ECF 22-4, at 3 ¶ 7. She recalls that she likely only saw him because she was filling in for someone. *Id.* The first time she saw him was on March 22, 2023, for a chronic care visit and a follow-up visit regarding a toe fracture. *Id.*; *see also* ECF 24-2, at 5–7. The toe fracture was healing and needed no further treatment; Dr. Jahed continued Mitchell's prescriptions for Cymbalta 20 mg, Ibuprofen 600 mg twice a day, and methocarbamol (Robaxin) 500 mg twice a day until June 21, 2023. *Id.* The second time Dr. Jahed saw Mitchell was for a physical on January 10, 2024. ECF 22-4, at 3 ¶ 8; *see also* ECF 24-8, at 11–14.

Defendants further claim that the medical attention provided to Mitchell was constitutionally adequate. They explain that the x-ray taken on January 28, 2022, showed that Mitchell's vertebral body heights and disc spaces were intact; that there was "sequela of spondylolisthesis" at L5-SI with chronic malalignment with an old injury to that area. ECF 24-16, at 27. The following day a detailed referral form was completed by Razia Subuliba, NP, requesting a neurosurgery consultation. *Id.* at 14–26. The referral documented that Mitchell had a history of

chronic back pain and had already undergone a lumbar laminectomy in 2015. *Id.* at 14. She further noted that Mitchell had previously received epidural injections in 2019 and was last seen by a neurologist in October 2, 2023, for lower back pain management and had a nerve conduction study of his lower limbs, with one study showing evidence of right L4/L5 radiculopathy and mild neuropathy. *Id.* She noted that the neurologist's plan was to increase the Cymbalta prescription and refer him to neurosurgery. *Id.* The report specifies that Mitchell's laminectomy was a "L5 laminectomy with [bilateral] L5 foraminotomies, partial L4 laminectomy and posterior spinal fusion of L5-S1 in 2015." *Id.* at 22. The report also notes that Mitchell "underwent physical therapy in the past but it did not help." *Id.* This neurosurgery consultation request was denied as not demonstrating medical necessity, and the ATP suggested to continue the current medical treatment and to educate Mitchell on "avoidance of any provocative movements and posture education." *Id.* at 12–13.

Sebuliba saw Mitchell again on July 15, 2022, for back pain. ECF 24-3, at 36; ECF 24-4, at 1–2. Mitchell was walking with a cane, Sebuliba made a plan to refer him to an orthopedic surgeon and for physical therapy; she also discussed with him diet, exercise and the value of weight reduction for pain management. ECF 24-4, at 1; *see also* ECF 24-3, at 34–35 (consultation request). Additionally, she prescribed Ibuprofen (400 mg) and methocarbamol (500 mg), a muscle relaxer, to manage the pain. ECF 24-4, at 1–2.

On July 18, 2022, the referral request for PT and orthopedic surgical consult was returned by the UMMD for a physical exam, documentation of treatments trialed, and available x-rays. ECF 24-14, at 13. On August 2, 2022, the request for an onsite orthopedics evaluation was denied with an ATP stating that the UMMD was unable to determine medical necessity with the information provided. *Id.* It was suggested that the onside provider reevaluate Mitchell with an

included "targeted musculoskeletal examination and x-rays." *Id.* The ATP was submitted to the Statewide UMMD for further review that same day. *Id.* On September 21, 2023, Mitchell had been evaluated with further studies and had a pending neurosurgery evaluation. *Id.*

After UMMD approved Mitchell for one session of physical therapy on August 24, 2022, ECF 24-14, at 18, he was seen by Physical Therapist Stephen Ryan for an evaluation on September 6, 2022, ECF 24-3, at 15–16. After his assessment, Ryan recommended 10 sessions for Mitchell. *Id.* On September 28, 2022, a request for 10 additional sessions was sent to UM, the following day the UMMD requested notes from Ryan's examination. ECF 24-3, at 7–10; ECF 24-14, at 30. Ryan's September 6, 2022, examination note was sent to the UMMD on November 7, 2022, but the UMMD found that the request did not demonstrate medical necessity. *Id.* The home exercise program that Ryan had educated Mitchell on was to be trialed before physical therapy sessions would be approved. *Id.* On December 27, 2022, Mitchell was given a back brace for lumbar support which was approved for his use for two years. ECF 24-11, at 36.

Although Mitchell's medical records indicate that his chronic pain was being monitored and managed with prescription medications as well as providing him with a cane and a home exercise program, by May 30, 2023, when Mitchell saw Dr. Abduzahed Jahed, his condition seemed to have worsened. ECF 22-2, at 12 ¶ 12; ECF 24-1, at 28–31. The examination revealed that Mitchell had bilateral muscle weakness with no right patellar reflex and the left at +3. *Id.* at 31. Dr. Jahed also noted he had muscle spasm and moderate pain when he moved, and he could not tolerate raising either leg beyond 20 degrees. *Id.* at 30. The notes indicate that Dr. Jahed was concerned that Mitchell's prior fusion may have failed and that he needed "neurology reevaluation or at least first MRI of the lumbar spine." *Id.* at 31. Dr. Jahed requested both. ECF 24-15, at 4–6. The request was denied by the UMMD with an ATP suggested for a walking aid and a home

exercise program. *Id.* at 4. The ATP was appealed on June 16, 2023 to the Statewide UMMD but the ATP was upheld on June 21, 2023, with approval for an EMG study. *Id.*

On August 4, 2023, Mitchell was seen by neurologist Dr. Said Dahbour for the EMG/nerve conduction study. ECF 24-11, at 17–19. The study revealed evidence of right L4/L5 radiculopathy and very mild length-dependent sensory neuropathy. *Id.* at 17. Dr. Dahbour recommended that Mitchell's Cymbalta prescription be increased to 60 mg once daily with the other medications he was taking continued and that he should be referred for neurosurgery consultation as well as pain management for possible spinal cord stimulation given his prior history of spinal surgery. *Id.* at 19.

Dr. Dahbour's recommendations to increase Cymbalta to 60 mg and to refer Mitchell to Neurosurgery were reviewed by Sebuliba on January 26, 2024. ECF 22-2, at 18 ¶ 41; *see also* ECF 24-8, at 1–4. Based on those recommendations, the prescription was increased and another neurosurgery consultation request was submitted. ECF 24-8, at 3. Sebuliba submitted a request for a neurosurgery consultation on January 29, 2024. ECF 24-16, at 14–18. This request was returned by the UMMD with an ATP and a finding of no demonstrated medical necessity. *Id.* at 13. It was further noted that no progressive neurological deficits had been documented making an MRI unnecessary. *Id.* The ATP was accepted on February 29, 2024. *Id.* at 12.

It was not until July 31, 2025, that an urgent request for an MRI for Mitchell's back was approved after he reported his concern that his pain was intensifying. ECF 24-5, at 34; *see also* 32–33. The MRI was pending scheduling when Mitchell was released from incarceration in November of 2025. ECF 22-2, at 22 ¶ 54.

## II. Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(a). A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When, as here, the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for a court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; a court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

Mitchell was on notice that the Court could treat the motion as one for summary judgment and rule on that basis. ECF 22, at 1. Mitchell was also explicitly warned that the motion was one seeking summary judgment and that the failure to respond to the motion may result in entry of judgment against Mitchell. ECF 23, at 1–2. Moreover, Defendants rely on exhibits attached to their motion. Because the Court will consider Defendants' exhibits, the Court must convert the motion to dismiss to a motion for summary judgment. *See Carter v. Balt. Cnty.*, 39 F. App'x 930, 933 (4th Cir. 2002) (per curiam) ("[N]o formal notice of conversion by the district court is required in cases where it is apparent that what is nominally a Rule 12(b)(6) motion to dismiss is subject to conversion to a summary judgment motion—for example, where the motion is captioned in the alternative as a motion for summary judgment and affidavits are attached to the motion.").

Summary judgment is governed by Fed. R. Civ. P. 56(a) which provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion since, "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The Court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## III. Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th

Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (noting that there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839–40. Under this standard, "the prison official must

have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson,* 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce,* 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris,* 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton,* 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *see also Jackson,* 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

The undisputed record evidence establishes that Mitchell had a serious chronic pain condition. That same evidence also establishes that these Defendants repeatedly submitted consultation requests, even after they were denied, in an effort to advance Mitchell's care. Eventually, those referrals were successful but in the interim, each of these Defendants (with the exception of Dr. Memarsadeghi, who the record establishes had no contact with Mitchell) did everything they could to relieve Mitchell's pain with medications, exercises, a cane to assist with his walking, and repeated x-rays along with repeated physical examinations to document whether he was losing neurological function. By the time he was approved for an MRI, which likely would have revealed more information than any of the prior examinations or x-rays had provided,

Mitchell was released from custody. Viewed as a whole, Mitchell's claim is based on his disagreement with the apparently conservative treatment he received, which itself is not an actionable basis for an Eighth Amendment claim. *See United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable."). Though Mitchell was understandably unhappy with the progress of his treatment, the undisputed record reflects that Defendants actively made efforts to advance his care. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Anderson*, 877 F.3d at 543. As such, and based on the undisputed factual record and arguments that Mitchell did not respond to, Defendants are entitled to summary judgment in their favor.

A separate order follows.

September 1, 2026
Date

/s/
Brendan A. Hurson
United States District Judge